# DECLARATION OF SPECIAL AGENT CASEY BLASER

I, Casey Blaser, Special Agent (SA) of the United States Secret Service (USSS), assigned to the Raleigh Resident Office of the USSS, pursuant to 28 U.S.C. § 1746 and the laws of the United States, hereby declares under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION

1.      This declaration is made in support of a complaint to forfeit funds previously seized from a virtual currency (VC) address [hereinafter referred to as the "**SUBJECT VIRTUAL CURRENCY ADDRESS**"].  This address contained proceeds and/or comingled funds of a cryptocurrency confidence investment scheme, whereby one or more criminal fraudsters used a fraudulent cryptocurrency exchange to commit wire fraud by inducing multiple victims, including but not limited to one victim in the Eastern District of North Carolina identified herein as W.B., to send money to VC addresses controlled by the fraudsters.  Once they received the VC, it was rapidly transferred to other VC addresses, one of which was subsequently frozen by the USSS. The USSS previously obtained a seizure warrant (Case No. 5:25-MJ-2552-BM) pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) to bring traceable proceeds and other comingled funds involved in wire fraud and money laundering into government custody and now submits this declaration to support the funds' forfeiture.

## DECLARANT'S BACKGROUND AND EXPERTISE

2.      I am a Special Agent (SA) with the United States Secret Service (USSS) assigned to the Raleigh (NC) Resident Office.  I have been employed with the USSS as a Special Agent since January 2024.  I have completed extensive training at both the Criminal Investigator Training

1

GOVERNMENT EXHIBIT

A

Program at the Federal Law Enforcement Training Center, Artesia, NM and the Special Agent Training Course at the USSS training facility located in Beltsville, MD.  This training included instruction in general law enforcement and criminal investigations to include violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Title 18, United States Code, Section 1956(a)(1)(B)(i) (Money Laundering).  During my time with the Secret Service, I have conducted numerous financial crime investigations involving cryptocurrency and other financial instruments.

## PURPOSE OF THE DECLARATION

3. I make this declaration in support of the civil forfeiture of the proceeds of a criminal scheme to defraud W.B. executed in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud); and co-mingled funds that were involved in the unlawful laundering of such property in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to commit money laundering).  Specifically, this declaration supports the civil forfeiture of the following assets that were previously seized and brought into government custody on January 15, 2026:

    a. 2,421,304.76529 USDT  virtual currency  (formerly held in **SUBJECT VIRTUAL CURRENCY ADDRESS** TH9zb9ddpx6VwAwan2kmmJusrMcB8PSHic on the Ethereum blockchain).

4. As explained below, the foregoing funds represent directly traceable criminal proceeds and/or money involved in the laundering of those proceeds, which were derived from a criminal fraud scheme that successfully defrauded W.B. by impersonating legitimate cryptocurrency exchanges and inducing victims to transfer VC to addresses belonging to the fraudster(s).

## BACKGROUND OF CRYPTOCURRENCY

5.      Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.      Blockchain: A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

b.      Smart Contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided in the contract's code, without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum blockchain protocol to maintain transparency. Smart contract technology is one of Ethereum's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum blockchain. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction

contemplated by a smart contract occurs on the Ethereum blockchain and is both trackable and irreversible.

c.  Virtual Currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (*i.e.*, they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. Each unit of virtual currency is often referred to as a "coin" or "token". The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (*e.g.*, online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and ETH, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

d.  Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

4

e. Tether Limited ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

f. A Virtual Currency Address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

   i. *Tether*: Tether, widely known as "USDT," is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin." USDT is issued by Tether Ltd., an international company. Tether is connected to Bitfinex, a cryptocurrency exchange registered in El Salvador.

   ii. Like other virtual currencies, USDT is sent to and received from USDT "addresses." A USDT address is somewhat analogous to a bank account number and is represented as a 46-to 48-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction.

   iii. Although the identity of a virtual currency address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular addresses holding USDT. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

5

g.    A Virtual Currency Wallet (*e.g.*, a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

h.    Hardware Wallet: A hardware wallet is a physical, removable device that stores a user's private keys and can be connected to a computer when a user wishes to use the keys stored on the wallet for virtual currency transactions. Hardware wallets can be secured with PINs and passphrases and can be backed up or regenerated with a recovery phrase. Trezor and Ledger are some examples of the types of hardware wallets on the market.

i.    Hosted Wallet: A hosted wallet, also known as a custodial wallet, is a virtual currency wallet through which a third party, *e.g.*, a virtual currency exchange, holds a user's private keys. The third party maintains the hosted wallet on its platform akin to how a bank maintains a bank account for a customer, allowing the customer to authorize virtual currency transactions involving the hosted wallet only by logging into/engaging with the third party's platform.

j.    Multi-Signature Wallet: Multi-signature (or "multisig") wallets (also sometimes called "multisig vaults" or "safes") require two or more private key signatures to authorize transactions. Multi-signature wallets requiring more than two private key signatures can be designed so a majority of keys is needed to authorize transactions.

k.    Paper Wallet: A paper wallet is an offline paper record of a virtual currency wallet's public and private keys. Paper wallets can include barcodes (*e.g.*, a QR code) along

6

with their alphanumeric strings. It is literally private keys printed on a piece of paper.

l.      Software Wallet: A software wallet is an internet-connected virtual currency wallet in the form of a software application on a desktop or mobile device or a web-based platform accessible through a web browser. The software will store and usually encrypt the user's public and private keys.

m.      Unhosted Wallet: An unhosted wallet, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.*, a virtual currency exchange) to facilitate a transaction involving the wallet.

n.      Blockchain Analysis: As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (e.g., the ETH blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity.

o.      Virtual Currency Exchange: A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (*i.e.*, an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or

7

decentralized (*i.e.*, a peer-to-peer marketplace where transactions occur directly between parties).

p.   Back-Tracing: In back-tracing, instead of tracing forward to find out where the funds were sent, the analyst traces backwards to see what other addresses had sent funds to the consolidation addresses, and where those funds originated. This technique has been found to be very successful in locating additional victims who may not have reported the scam or may not yet be aware they are a victim.

## FACTS SUPPORTING FORFEITURE

6.   This case concerns a fraud scheme to steal cryptocurrency from a victim, W.B, residing in the Eastern District of North Carolina, as well as other victims. The scheme was perpetrated through an unsolicited text message which led to an online relationship and then to the victim being convinced to send money to a fraudulent cryptocurrency investment platform. This type of scam, and other similar scams involving fraudulent cryptocurrency investments, are collectively known as "cryptocurrency confidence investment schemes" (CCIS) and resulted in victims losing over $6.5 billion in 2024, according to the FBI's fraud reporting database. The investment schemes have the appearance of a legitimate enterprise through the use of fabricated interfaces, derivative websites that appear related to legitimate companies, and other techniques designed to bolster the scheme's legitimacy. This generally includes a fake investment platform operated through a website or mobile application that displays a fictitious investment portfolio with abnormally large investment returns. The investment platforms are a ruse, and the funds contributed are routed directly to a cryptocurrency address the scammers control. In reality, the victims do not have actual "accounts" at the fake companies – as soon as the victim sends cryptocurrency to the deposit address provided by the scammers, it is generally moved through

many other wallets in order to launder the funds and make them harder to trace. The victims are able to see what they believe are their deposits on the fraudulent platform, and the purported large returns on their investments are designed to convince them to invest more. When the victims do attempt to withdraw their funds, they are unable to do so and are often met with various excuses, such as being told they are required to pay "taxes" in order to release their funds. The "tax" payments are an attempt by the scammers to elicit even more money out of the victims. The scammers, in the form of "customer service" for the fraudulent platform, will continue to ask for additional payments from the victim, while promising that the victim will be able to withdraw once the payment is made. However, the scammers will not release the funds regardless of how much is paid. In this particular fraud case, two individuals residing in North Carolina and Texas were the victims of a CCIS scheme. These individuals were approached and recruited into the scam in different ways, but analysis of the fake investment platforms they were directed to, as well as tracing of the cryptocurrency that they sent, shows that they were likely victimized by the same person or group. The following sections explain the background of each victim's enticement into the scheme, followed by details on the tracing of each victim's cryptocurrency transactions that linked them together. For clarity, all subsequent cryptocurrency addresses have been shortened to the first eight characters.

### Victim W.B.

7. W.B. is a 71-year-old resident of Raleigh, NC. Approximately between the first and second week of January 2025, he received an unsolicited message on the Telegram app from a person claiming to be a woman named "Helena MILLER" living in New York City. MILLER told W.B. that she had been trying to contact another individual but reached W.B. accidentally. After this initial contact, MILLER began a relationship with W.B. by gathering personal information

9

about him and explaining how she has years of experience working in finance and became wealthy through cryptocurrency investing.

8. After approximately 1-2 weeks of communicating, MILLER began encouraging W.B. to invest in cryptocurrency using her guidance and strategies. At MILLER's direction, W.B. opened an account at the Coinbase cryptocurrency exchange, as well as an un-hosted wallet using the Coinbase Wallet app. She also directed him to open an account at what she claimed was the investment platform she used, "Capital One Financial Global Markets" [aka COF Global Markets], using the URL "cofmarketsltd.com". She told W.B. that this platform was associated with Capital One, the well-known financial services company based in the United States. This is not a URL associated with the legitimate company Capital One. W.B. visited this website, saw what appeared to be a legitimate cryptocurrency investment platform, and successfully created an account. In fact, this website had been created by the suspects and was completely fraudulent.

9. MILLER then convinced W.B. to begin with an investment of $50,000 and directed him through each step of the process. After sending $50,000 from his bank account to his Coinbase account, W.B. used this money to purchase 14.57868308 ETH on January 21, 2025. He then sent this ETH from his Coinbase account to his unhosted Coinbase Wallet, at address 0x22dbe7. At this point the ETH was still under his control. He then used the COF Global Markets site to obtain what he believed was a deposit address for his COF Global Markets account, 0xdb8a51, and sent the ETH to this address. In reality, this address was part of a wallet controlled by the suspects and once he made this transaction, the suspects had complete control of the funds. However, W.B.'s purported account on COF Global Markets was updated to show the ETH being received, which made him believe he still had control over the funds and that they were safe.

10.     W.B. then began conducting "trades" using these funds, again at MILLER's direction, and saw large profits accumulating in his COF Global Markets account. These profits were also fake, and were being shown to W.B. by the suspects, in the hopes of getting him to invest more money. After this initial investment and trading, MILLER continued to communicate with W.B. frequently and encourage him to invest more.

11.     Upon seeing his investment increase and believing it to be legitimate, on January 31, 2025, W.B. sent an additional $740,000 to his Coinbase account, which he used to purchase an additional 219.82762799 ETH. He then went through the same process, sending this ETH to his un-hosted wallet and then to his purported COF Global Markets deposit address, 0xdb8a51. W.B. continued conducting trades with these funds, at MILLER's direction, and seeing additional profits accumulate in the COF Global Markets account.

12.     On or about February 5, 2025, W.B. contacted MILLER asking to withdraw his invested ETH to convert it back into U.S. currency and return it to his bank account. W.B. stated that MILLER became irate at this request before hanging up the phone. From this point W.B. became concerned and contacted his local bank, who advised him to contact the Wake County Sheriff's Office and the Federal Bureau of Investigation (FBI). During this process W.B. was advised that he was likely the victim of a scam.

13.     After reporting the scam to the Wake County Sheriff's Office, the investigator assigned to the case contacted the USSS Raleigh Resident Office and requested assistance with tracing W.B.'s cryptocurrency transactions. USSS personnel were able to successfully trace W.B.'s transactions and freeze related funds, as detailed further below.

11

**Victim K.O.**

14. A second victim involved in this scheme, K.O., was discovered in Friendswood, TX. As part of the scam, K.O. sent Bitcoin totaling approximately $1.1 million.

15. K.O. is a 70-year-old resident of Friendswood, TX. On January 17, 2025, K.O. received an unknown phone call from an Asian female, identifying herself as "Chen LI". LI claimed she was attempting to contact a female friend and then realized she had the wrong number. K.O. ended up having a conversation with her over the phone, and LI began telling K.O. about how she was an investor with Bitcoin. She told him that she used Bitcoin to buy and short sell gold and told him that she made a lot of money doing this. K.O. and LI then had multiple conversations about cryptocurrency investments, and she convinced him to invest some of his money in the investment platform she used, which she claimed was associated with Prudential, the well-known financial services company. This platform was called "Prudential Investments" and was accessed through the URL "prudengcc.top", which is not a URL associated with the legitimate Prudential company. At LI's direction, K.O. opened an account at Coinbase. She also provided him with access to her account at Prudential Investments and said that they would invest and trade using a shared account.

16. K.O. made his initial investment on March 3, 2025, by sending $100,000 from his bank account to his Coinbase account, using this money to purchase 99,572 USD Coin (USDC) and then sending that to an address he believed was a deposit address for his Prudential Investments account, 0x6791a9. From then into the beginning of April, K.O. made a series of six more investments, which resulted in him having sent USDC worth a total of approximately $1,117,003 to the same address. During this period, LI had also gotten K.O. to become a "member" at Prudential Investments by including additional information about himself, such as his driver's

12

license number, to the account. Once that was established, K.O. was told that he was "locked in" to the account and required additional investments. After making all of his investments and trading at LI's direction, K.O. was able to see that the account was valued at over $5 million, approximately $1.1 million belonging to K.O. and $3.9 million belonging to LI.

17. K.O.'s last investment into the Prudential Investment account was on April 7, 2025. K.O. then told LI that he wanted to withdraw his investment of $3.9 million, so they initiated the transfer through the Prudential Investments website. K.O. became suspicious that he was being scammed once the transfer was flagged and put on hold. He received an email stating he needed to pay approximately $700,000 in taxes in order to complete the withdrawal. K.O. did not pay this additional amount and was told that there would be a lock on the money he had invested into the account as well.

18. On June 2, 2025, K.O. reported this scam to the Friendswood (Texas) Police Department. The assigned detective requested assistance from the local FBI field office, who assisted him with tracing K.O.'s cryptocurrency transactions. The FBI analyst found that an address that had received some of K.O.'s funds had been frozen and contacted the USSS to provide additional information on K.O.'s case. The frozen address they located was the **SUBJECT VIRTUAL CURRENCY ADDRESS**. Further information relating to K.O.'s cryptocurrency transactions is detailed below.

### Tracing of Victim Funds to the SUBJECT VIRTUAL CURRENCY ADDRESS

19. Based on information provided by W.B. and K.O, and verified using publicly available blockchain data, the cryptocurrency transactions described above were identified and traced. The subsequent movement of the funds was then traced, which led to the **SUBJECT**

13

**VIRTUAL CURRENCY ADDRESS**. The traces were conducted using the Last-In-First-Out accounting principle – meaning that the most recently deposited items are recorded as the next withdrawal. In some cases, the cryptocurrency amounts noted may not add up to the initial amount that was stated. This is due to the fee that each blockchain charges for a transaction, which will reduce the amount of cryptocurrency sent by a small amount.

20. The following is a summary of transactions emanating from investments made by W.B.:

 a. On January 21, 2025, W.B. sent 14.57830508 ETH from his Coinbase account to his noncustodial Coinbase Wallet (address 0x22dbe7). On January 22, 2025, W.B. sent 14.57807403 ETH from his Coinbase Wallet to address 0xdb8a51. This address was provided to him by the fraudulent COF Global Markets platform, which told him that this was the deposit address for his account there.

 b. On January 31, 2025, W.B. sent 219.82731299 ETH from his Coinbase account to his noncustodial Coinbase Wallet (address 0x22dbe7). Later on January 31, 2025, W.B. sent 219.82721493 ETH from his Coinbase Wallet to address 0xdb8a51.

 c. On February 5, 2025, 1 ETH was sent from address 0xdb8a51 to W.B.'s Coinbase Wallet. I know from experience with previous cases that this is a common tactic in CCIS fraud – the suspects allow victims to withdraw a small amount from their "account" in order to show them that the investment platform is legitimate and that they will be able to withdraw all of their investments in the future as needed.

 d. On April 17, 2025, the combined ETH from W.B.'s transactions, 233.4 ETH,

was sent from 0xdb8a51 to address 0x8935ea.

e.     On May 17, 2025, this 233.4 ETH was sent to two accounts at the cryptocurrency exchanges OKX and HTX, in a series of four transactions. Records received from OKX and HTX showed that both of these accounts were owned by a Vietnamese female, Le Thi Thu HANG. There are multiple indicators that the primary purpose of these accounts was to launder funds received from fraud victims. Both of these accounts were recently established, approximately two months prior to the transactions being sent there. They appear to be "pass-through" accounts where the account holder was not the intended custodial recipient, as all of the various types of cryptocurrency being sent there, including the ETH from W.B., were immediately converted to USDT and then withdrawn on the Tron blockchain. I know from experience that this is highly indicative of accounts used for money laundering in cryptocurrency fraud cases, as USDT on the Tron blockchain appears to be the favored form of cryptocurrency for the criminal groups engaged in CCIS fraud. This is likely because USDT is a stablecoin that does not fluctuate in value like Bitcoin or Ether, and the Tron blockchain is capable of faster transactions with lower fees than many other blockchains. Another indication of money laundering is that all of the converted USDT was sent to the same Tron address after passing through the OKX and HTX accounts. The following transactions all occurred on May 17, 2025:

        i.    At 4:09 PM (UTC), 58 ETH was sent from 0x8935ea to 0xf09b70, a deposit address at HTX.

ii. At 4:10 PM (UTC), 52 ETH was sent from 0x8935ea to 0x122466, a deposit address at OKX.

iii. At 4:28 PM (UTC), 62 ETH was sent from 0x8935ea to 0xf09b70.

iv. At 5:14 PM (UTC), 61.39992881 ETH was sent from 0x8935ea to 0xf09b70.

f. On May 17, 2025, each of the ETH deposits sent to HANG's OKX and HTX accounts was converted to USDT and then withdrawn in the following transactions:

i. At 4:28 PM (UTC), 143,056 USDT (converted from 58 ETH) was sent from HANG's HTX account to address TE8ZFKKL, an un-hosted wallet on the Tron blockchain.

ii. At 5:11 PM (UTC), 128,406 USDT (converted from 52 ETH) was sent from HANG's OKX account to address TE8ZFKKL.

iii. At 5:11 PM (UTC), 152,900 USDT (converted from 62 ETH) was sent from HANG's HTX account to address TE8ZFKKL.

iv. At 5:35 PM (UTC), 151,167 USDT (converted from 61.39992881 ETH) was sent from HANG's HTX account to address TE8ZFKKL.

g. On May 18, 2025, 536,982 USDT was sent from TE8ZFKKL to the **SUBJECT VIRTUAL CURRENCY ADDRESS** ("TH9zb9dd"), where it was

16

commingled with other funds already housed in the **SUBJECT VIRTUAL CURRENCY ADDRESS**.

h.  Exhibit 1, also reproduced below, is a graphical representation of these transactions:

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]



18

21.     The following is a summary of transactions emanating from investments made by K.O.:

a.     From March 4 through April 7, 2025, K.O. sent the following USDC transactions from his Coinbase account to address 0x6791a9.  This address was provided to him by Chen LI, who told him that this was the deposit address for their shared account at the fraudulent Prudential Investments platform.

    i.     March 4, 2025: 99,572 USDC

    ii.     March 7, 2025: 200,037 USDC

    iii.     March 8, 2025: 50,394 USDC

    iv.     March 13, 2025: 190,000 USDC

    v.     March 18, 2025: 237,000 USDC

    vi.     April 2, 2025: 230,000 USDC

    vii.     April 7, 2025: 110,000 USDC

b.     On April 17, 2025, 1,016,653 USDC was sent from 0x6791a9 to address 0x3a9637, where it was commingled with other funds already housed in address 0x3a9637.

c.     Continuing on April 17, 2025, a total of 1,207,690 USDC was sent over three transactions from address 0x3a9637 to HANG's account at the OKX exchange, using the same deposit address identified in W.B.'s trace (0x122466).

    i.     April 17, 2025, at 12:24 PM (UTC): 402,369 USDC

    ii.     April 17, 2025, at 12:51 PM (UTC): 435,680 USDC

    iii.     April 17, 2025, at 1:18 PM (UTC): 369,641 USDC

d. As was the case with the ETH sent by W.B., the USDC sent to HANG's account (0x122466) at OKX was quickly converted to USDT and then withdrawn on the Tron blockchain to the same address, TE8ZFKKL, in the following transactions:

 i. April 17, 2025, at 12:47 PM (UTC): 402,176 USDT

 ii. April 17, 2025, at 1:17 PM (UTC): 435,619 USDT

 iii. April 17, 2025, at 1:42 PM (UTC): 369,587 USDT

e. Continuing on April 17, at 1:47 PM (UTC), 1,206,853 USDT was sent from TE8ZFKKL to the **SUBJECT VIRTUAL CURRENCY ADDRESS**.

f. The remaining 100,350 USDC that had been sent to 0x6791a9 and was not withdrawn on April 17, 2025, remained in this address until May 15, 2025, when it was sent to address 0x263362. Within this wallet, the USDC was commingled with other funds already housed in 0x263362.

g. Continuing on May 15, 2025, 112,080 USDC was sent from 0x263362 to HANG's account at HTX, using the same deposit address identified in W.B.'s trace (0xf09b70).

h. Once again, the USDC sent to this account was quickly converted to USDT and withdrawn, as 111,956 USDT, on the Tron blockchain to address TE8ZFKKL.

i. On May 17, 2025, 386,590 USDT was sent from TE8ZFKKL to the **SUBJECT VIRTUAL CURRENCY ADDRESS**, where it was commingled with other funds already housed in the **SUBJECT VIRTUAL CURRENCY ADDRESS**.

j. Exhibit 2, also reproduced below, is a graphical representation of these transactions:



22. On May 18, 2025, the USSS discovered, through records received from OKX, that the funds sent to HANG's OKX had been sent to address TE8ZFKKL. Although records from HTX had been requested but not yet received, analysis of this address showed that the funds sent to HANG's HTX account had likely been sent here as well. Continued tracing of these funds showed that they had subsequently been sent, in a single transaction of 536,982 USDT, to the **SUBJECT VIRTUAL CURRENCY ADDRESS**, where they were commingled with 2,341,715 USDT already present in the address. On May 19, 2025, at 12:14 AM (EST), the USSS contacted Tether and requested that TH9zb9dd be frozen. Subsequent to this request, but prior to Tether completing the freeze on May 21, 2025, there were three outgoing transactions, for a total of 1,293,088 USDT, and four incoming transactions, for a total of 835,695 USDT, to the address. Further tracing was conducted on the outgoing transactions, and additional freezes with Tether were attempted but were unsuccessful. When the freeze was completed by Tether on May 21, 2025, the address contained 2,421,304 USDT. Of these funds, 536,982 USDT are directly traceable to W.B., and 697,252 USDT are directly traceable to K.O. These amounts were calculated by using the "proceeds out last" accounting methodology, subject to the Lowest Intermediate Balance Rule (LIBR).

23. There are several factors which indicate that the two victims described above are part of a larger fraud scheme. These factors show that the **SUBJECT VIRTUAL CURRENCY ADDRESS** has been used not only to launder the proceeds of criminal activity received from W.B. and K.O., but from numerous other victims. It is the belief of the affiant that additional factors exist, which have yet to be uncovered by law enforcement. The facts currently known to law enforcement include:

    a. *Shared cryptocurrency addresses and patterns of activity:* In CCIS schemes,

victims are often given individual crypto addresses which are provided only to that particular victim. This is the address that victims are told is their deposit address at the fraudulent exchange. When a victim sends cryptocurrency to their individual address, the crypto is then quickly sent to another address where funds from multiple victims are consolidated. This same pattern was observed in this case (*see* Exhibit 3). Additionally, the tracing of victim transactions in this case showed that all the victims' transactions were sent through the same two exchange accounts referenced previously, OKX and HTX accounts belonging to Le Thi Thu HANG. The activity in HANG's accounts also matches that of other CCIS schemes. Nearly all the various forms of cryptocurrency received in these accounts were quickly converted to what appears to be the scammers' favored form of crypto, USDT, and then withdrawn on the Tron blockchain. Most of the withdrawals from both accounts were sent to just two addresses, TE8ZFKKL and TYyVoMUg. In total, HANG's accounts received cryptocurrency worth over $25 million from February 2, 2025, to August 2, 2025. Approximately $16.1 million worth of that cryptocurrency was then sent to TH9zb9dd, while another $4.2 million was sent to TYyVoMUg. Of the $16.1 million, approximately $11.2 million was then sent from TE8ZFKKL to the **SUBJECT VIRTUAL CURRENCY ADDRESS.**

b. *Backtracing to Identify Additional Potential Victims:* Exhibit 3 (below) was created by "backtracing" from all the addresses that sent to HANG's exchange accounts. In backtracing, instead of tracing forward to find out where the funds were sent, the analyst traces backwards to find out where those funds originated

from, which in every case was an exchange, either Coinbase or Crypto.com. This technique has been found to be very successful in locating additional victims who may not have reported the scam or may not yet be aware they are a victim. Backtracing from HANG's accounts indicate at least 25 additional potential victims of this same fraud scheme. This was further bolstered by conducting a search for each of the individual victim addresses on the FBI's IC3 and the Federal Trade Commission's Consumer Sentinel fraud reporting databases. Reports were found from two additional victims, G.S. and W.K., who reported a similar fraud scheme and provided addresses found through backtracing as their purported deposit addresses.

c. *Circular transactions:* Another pattern of activity was observed in HANG's OKX account which further indicates the account is primarily used for money laundering. On April 7, 2025, a total of 890 ETH (worth approximately $1.4 million at the time) was not converted to USDT, but was withdrawn to an Ethereum address, 0xc9ea50. This ETH was then split up, sent through two other addresses, and then sent back to the same OKX account. As each of these transactions incurred a transaction fee, there is no legitimate reason to conduct a circular transaction of this nature, and the purpose therefore was likely to continue obfuscating the original source of the funds. This pattern is indicated by the red line on the below chart.

d. *Other Victim Reporting:* Additional searches of IC3 and Consumer Sentinel identified 32 other potential victims of this scam, in addition to the two additional victims identified above through backtracing. These victims were

24

located by searching for variations of "COF Global" in the databases.  Each of these victims reported a similar scam to those detailed here, with some variations in how they were recruited for the scam, the name the scammer used when contacting the victim, and the specific URL used to access the platform.

[THE REMAINDER OF THIS PAGE WAS INTENTIONALLY LEFT BLANK]



Crypto.com

Coinbase

Victim G.S
(IC3 report)

Victim
K.O.

Victim W.B.

Victim W.K.
(IC3 report)

HANG OKX
account

Subject
Address

TRON address
TE8ZFKKL

HANG
HTX account

Each circle in this box represents a likely victim – each one is an address that received crypto from an exchange and sent it on to a "consolidation" address

Consolidation address-funds from multiple victims are pooled here

**CONCLUSION**

24. For the foregoing reasons, I respectfully submit that there is probable cause to believe that 2,421,304.76529 USDT virtual currency (formerly held in **SUBJECT VIRTUAL CURRENCY ADDRESS** TH9zb9ddpx6VwAwan2kmmJusrMcB8PSHic on the Ethereum blockchain) constitutes or is derived from proceeds traceable to a wire fraud scheme executed in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud) and/or was involved in money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to commit money laundering) and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and/or 18 U.S.C. § 981(a)(1)(A).

25. The foregoing facts are furthermore sufficient to support a reasonable belief that the defendant property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and/or 18 U.S.C. § 981(a)(1)(A).

Executed this 30th day of April, 2026.

*Casey Blaser*

_____

Casey Blaser
Special Agent
United States Secret Service

27